Per Curiam : This case was referred to Trial Commissioner W. Ney Evans with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Pule 57(a). The commissioner has done so in an opinion and report filed on January 19, 1968. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the rules of the court has expired. On March 4,1968, defendant filed a withdrawal of its notice of intention to except which had been filed on February 19, 1968, and requested that the court adopt the commissioner’s report as written. Since the court agrees with the commissioner’s findings, as modified, and the opinion and recommended conclusion of law as hereinafter set forth, it hereby adopts the same, as modified, as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Pule 47(c).
OPINION OF COMMISSIONER
Evans, Oormmssioner:
Plaintiff seeks by this action to recover the difference between the retirement pay he has received as a retired lieutenant colonel in the United States Army Peserve and the pay he would have received if he had been retired for physical disability. On the basis of a determination that findings of physical fitness entered by the physical review council and adopted by the physical disability appeal board were not supported by substantial evidence and were therefore arbitrary and capricious, it is concluded that the finding of 40 percent disability entered by the *923 physical evaluation board must be sustained, wherefore plaintiff is entitled to recover.
FINDINGS on Fact (As Modified by the Court)
L (a) On June 2, 1939, plaintiff, then 26 years of age,[1] was commissioned in the United States Army Reserve.
(b)He served continuously from the date of his commission until October 31, 1959, when he was released from active duty and placed on the Army retired list (effective November 1, 1959) in the grade of lieutenant colonel, with credit for over 20 years’ service as the basis of the computation of his retired pay.
2. (a) On January 16, 1959, the Adjutant General formally notified plaintiff (1) of his forthcoming release from active duty on August 31, 1959, “in accordance with the Army’s maximum service policy * * (2) of his eligibility, by July 31,1959, for voluntary retirement; and (3) of his right to apply for such voluntary retirement “to be effective not later than the above release date.”
(b) On May 18, 1959, plaintiff requested retirement on July 31,1959, or as soon thereafter as practicable, on the basis of having completed 20 years’ active service.
(c) On June 1,1959, he was hospitalized because of symptoms and complaints hereinafter described.
(d) On June 5, 1959, the Adjutant General forwarded to the Surgeon General a Report of Medical Examination with a request for review “and determination * * * as to whether hospitalization and/or further physical evaluation is indicated prior to separation from the Army.” Both hospitalization and further physical evaluation were continued for several weeks thereafter.[2]
3. On July 20, 1959, a medical board, convened at the Naval Hospital at St. Albans, New York, made the following report of plaintiff’s condition:
The Board met this date to consider disposition to be effected in the case of subject named member.
*924 This 46 year old Lt Col, USA, was admitted to St. Albans Naval Hospital on 1 June 1959 with a diagnosis of Kadiculoneuritis, n.e.c., L-5, Left, Cause Undetermined #3642.
The patient’s past medical history dated back to 11 August 1943 when he entered Hammond General Hospital with the diagnoses of (1) Malaria, tertian, recurrent, (2) Malnutrition, moderate, due to inadequate diet. This was after being returned from the southwest Pacific area where he had been on duty for the past 3 years. He had been hospitalized overseas in May and June of 1943 for malaria. The patient had noted the onset of dizziness, headache, shortness of breath and fatigue in April of 1943 and an elevation of blood pressure was recorded. On admission to Hammond General Hospital he complained of stiffness of the joints and of being 20 pounds underweight. While hospitalized at that time he had a recurrence of his malaria. On 24 November 1943 he was returned to general duty with the diagnoses of (1) Malaria Fever, tertian, recurrent, cured, (2) Arterial Hypertension, mild, cause undetermined, improved. In February of 1945 he was placed on the temporary limited service list because of hypertension. In January of 1945 he had his fifth attack of malaria and in all has had eight recurrences. The blood pressure at that time ranged from 122 to 164 mm. of mercury systolic and 80 to 96 mm. of mercury diastolic. The diagnosis of Arterial Hypertension, Mild, Cause Undetermined, Paroxysmal was made. On 12 September 1945 he was placed on general duty when the re-evaluation for hypertension revealed no disease found. The patient was re-hospitalized on 9 August 1947 for a fracture of the right knee. At that time he was compelled to leap from a moving train at Duncan, Oklahoma and sustained a fracture of the lateral condyle of the right knee. On 18 August an open reduction and fixation with screws of the fracture was carried out. He remained hospitalized for approximately 1 year following injury. Upon discharge he could flex the right knee to 115° with full extension. He could walk well and had no complaints of pain.
In October of 1957 the patient fell on his left hip. Since that time he has had intermittent low back and leg paim The pain was more pronounced in the left leg and radiated down the posterior thigh to the ankle. Coughing, sneezing and quick movements accentuated the pain. He was unable to sit without discomfort and *925 also complained of a numbness of the left leg and dorsum of the left foot.
The physical examination on admission revealed a scar on the right posterior chest as a result of a thoracotomy as a child. The back flexion was fluid through the first 40° but there was limitation beyond this point. There was 2+ paravertebral muscle spasm. A scar was noted over the right knee. The deep tendon reflexes at the knees and ankles were normoactive bilaterally. The extensor hallucis longus was of normal strength bilaterally. The straight leg raising was 80° on the right and 60° on the left. There was slight subjective hypesthesia to pin over the medial aspect of the left foot. No atrophy was noted.
The admission blood and urine laboratory findings were within normal limits. Spinal fluid protein was 27 mg.% and 3 cells were noted. A urea nitrogen was 16.5 mg.% and an electrocardiogram of April 1959 was reported as within normal limits. A phemolsul-fonaphthalein test revealed a total of 39% dye excretion for the total test and 22% in the first 15 minutes. The x-rays of the lumbosacral spines were normal except for sclerosis of the facets. The x-rays of the right knee showed an old fracture of the lateral condyle of the femur with 2 metallic screws in place. The fracture line was not visible and reduction was reported as being satisfactory. A lumbar myelogram carried out on 18 June 1959 was reported as normal. A barium swallow was also reported as normal. An upper G.I. series revealed a small hiatus hernia.
While in the hospital the patient was placed at bed rest, given muscle relaxants and analgesics. During hospitalization there was no significant change in his pain. He did complain of some fullness in his chest. Because of the past history of hypertension and the chest discomfort, a medical consultation was obtained. The medical consultant’s impression was Arteriosclerotic Heart Disease, Angina Pectoris, Regular Sinus Rhythm, with a Heart Classification of II-A. A consultant in orthopedics evaluated the right knee as follows: (1) Mal-union of a fracture of the lateral femoral condyle, right, (2) Chronic Synovitis, right knee, (3) Chondromalacia, right patella.
At the present time the signs and symptoms remain unchanged from on admission. The patient is ready for separation from active duty and it is the recommendation of the Board that he should appear before a Physical Evaluation Board for final adjudication.
*926 4. (a) The medical board recommended plaintiff’s appearance before a physical evaluation board. Such an appearance was made on July 29, 1959.
(b) In response to an inquiry by the president of the board as to whether he had any questions “on the diagnoses and/or documentary evidence,” plaintiff replied in the affirmative, whereupon he was permitted to elicit from the medical member information which may be summarized as follows:
(1) The numbers in the diagnoses are the Army Regulations Diagnostic Code Numbers.
(2) With respect to plaintiff’s hernia conditions “provisions are indicated for adequate medical treatment at a military institution, or through a Veterans Administration Facility.”
(3) The phenosulfonaphthalein test was a test of kidney function. Results were on the borderline.
(4) “Arteriosclerotic heart disease is when the heart is involved in a hardening process. * * * there are little plaques that form in the blood vessels, cutting off the blood supply which flows to the heart. It obstructs the blood flow. This is a disease that often starts in the early twenties * * * . It is probably a condition that most all of us have.”
(5) Regular sinus rhythm is normal.
(6) Heart Classification II-A refers to the American Heart Association Classification of heart conditions. “This is just a symbol which describes what discomfort or pathology you have, and you know what discomfort you do have.”
(7) Synovitis is * * * some inflammation of the knee membrane.
(8) Chondromalacia indicates some changes in the X-ray pictures of the bone.
(c) In a sworn statement before the physical evaluation board, plaintiff testified:
* * * at the present time I experience considerable difficulty in remaining seated very long, or standing for any length of time, and I cannot walk very far without tiring. I have difficulty in climbing more than one flight of stairs. The difficulty is in the weakness in my right knee, and the pain in my left hip, and this pain extending down my left leg.
*927 I get relief from this pressure type of feeling in my chest, vshich 1 have on occasions, by taking a pill. I am told that it is nitroglycerine * * *. [Emphasis supplied.]
(d) Following is an excerpt from the cross-examination of plaintiff by the medical member of the board:
Q. You mentioned some discomfort in the chest?
A. Yes.
Q. Where?
A. In the center portion. * * *
Q. You take nitroglycerine * * * for this condition; this shortness of breath ?
A. Yes.
Q. Do you find it effective; does it work ?
A. Yes, it does.
Q. How soon after ?
A. I would say within a minute.
5. Following is the statement, dated July 29,1959, by the president of the physical evaluation board:
The Board, after consideration of the evidence in the case of Lt. Colonel Paul L. McGiven, finds him physically unfit for further military service by reason of:
1. Radiculoneuritis, n.e.c., Lumbosacral, left, with muscle spasm on extreme forward bending, manifested ■by radiation of pain down the left lower extremity to the ankle, with paravertebral spasm, with slight limitation of forward bending, VA Code 5299/5294, disability 20 percent.
2. Femur, impairment of, right, malunion of fracture of lateral femoral condyle, chronic synovitis and chon-dromalacia, right patella, with moderate knee disability. YA Code 5255, disability 20 percent.
Arteriosclerotic Heart Disease was considered by the Board, but considered not rateable at this time.
The Board considers that his condition may be permanent.
The Board recommends that he be temporarily retired with 40 percent disability, and with further reexamination and reevaluation UP of paragraph 25c(l) (b) AN 635-40B, on or about 29 July 1960.
6. (a) A copy of the proceedings of the physical evaluation board was given to plaintiff with the advice that he might file a rebuttal statement. He requested and was given until August 17, 1959, to file such a statement. During the *928 interval lie requested and was accorded further medical examinations.
(b) Under date of August 11, 1959, a medical officer at the hospital filed the following consultation report:
This 46 year old white male officer states that he has had intermittent episodes of substernal “squeezing” chest pain brought on by mild to moderate physical exertion for the past 2 years with the past year being more severe than the first. The pain radiates to the left upper chest and occasionally leaves some soreness and weakness in the left shoulder and left upper extremity. The pain ordinarily lasts for 10-15 minutes and is severe enough to cause him to stop what he is doing. There is an associated feeling of pressure causing him to feel as though it is difficult to “get his breath.” There is also some feeling of pressure in the head with slight dizziness, but he has never become unconscious. _ The pain is brought on by walking up one flight of stairs at a normal rate or by any such physical exertion which causes slight dyspnea or increased cardiac rate. The pain is not brought on by overeating, sexual intercourse, walking in a cold wind, or extending hands over his head. Sublingual nitroglycerine relieves the pain within two or three minutes, almost without exception. The medication causes pounding in the head.
He has a past history of labile hypertension.
Examination: Slight overweight male who does not appear in any distress, but gets about with some difficulty due to his joint disease and radiculoneuritis. Blood pressures taken were as follows: LA 150/104; 148/98; 145/ 100; BA 145/94; 145/94. Eye grounds show grade i ar-teriosclerotic changes. Peripheral pulses normal. Chest, heart, lungs, abdomen and extremities normal.
ECG normal; Master’s two step test positive showing S-T depression in lead V-4 in the immediate ECG strip.
Impression: 1. Arteriosclerotic heart disease, angina pectoris, with American Heart Association Glassification IIB.
2. Essential hypertension.
Recommendations: The diagnosis of hypertension has not been fully investigated and the following should be done:
a. IYP and several urinalyses with a repeat PSP.
b. BP four times a day and recorded for several days, taking some following a period of rest.
*929 c. Repeat chest x-ray in PA, LAO, and RAO views.
Return to me when the above results are additional statement or addendum should probably be made for the PEB.
(c) The same medical officer inserted in the record the following statement:
Reevaluation of this patient’s case resulted in the following findings:
1. A positive Master’s exercise test.
2. No evidence of a sustained essential hypertension.
It is the opinion of this examining officer that the patient’s diagnosis is Arteriosclerotic Heart Disease with angina pectoris. His American Heart Classification is IIB.
(d) On the basis of the foregoing medical opinions, the medical board, on August 17, 1959, filed the following Addendum to the proceedings of the medical board of July 20, 1959:
Reevaluation of this patient’s case during the period 10-17 August 1959 resulted in the following findings which may be pertinent:
(1) A positive Master’s exercise test _
_ (2) No evidence of a sustained essential hypertension
(3) Sclerosis at the lumbosacral articulation
In view of the above, the following additional diagnoses should be added for consideration to those final diagnoses that were previously listed:
Arteriosclerotic Heart Disease with Angina Pectoris (4700) (American Heart Association Classification 11-B)
Degenerative Joint Disease, Multiple (Lumbosacral) (7230)
7. (a) On August 19, 1959, plaintiff forwarded to the president of the physical evaluation board a Statement of Rebuttal from which the following are excerpts:
* * * The undersigned officer does not wish to take issue with the PEB * * * in the disability ratings. * * * It is felt however that the physical limitations as now experienced due to each of the disabilities is something more than the twenty percent * * * allowed * * * and * * * recommended * * * .
* * * Following being advised by the president of the *930 PEB that the “Arteriosclerotic Heart Disease” as listed in the medical board summary was not rateable at the time, and feeling personally that the diagnosis was arrived at after a somewhat cursory examination, and knowing that a definite limitation does exist which is clearly associated with the above mentioned heart disease, the undersigned asked the medical board * * * to thoroughly reinvestigate the matter * * * and to completely evaluate the disability. * * * The medical board were receptive to the request and a complete reevaluation was conducted. * * *
* * * [I] t is requested that the undersigned’s physical disability be reviewed in the light of the following causes not previously considered: (Basis: incl 1, Addendum to Medical Board Proceedings).
1. Arteriosclerotic Heart Disease with Angina Pectoris (4700) (American Heart Association Classification II-B)
2. Degenerative Joint Disease, Multiple (Lumbo-sacral) (7230)
(b) The evidence[3] is silent as to any consideration of the foregoing rebuttal by the physical evaluation board.[4]
(c) On September 2, 1959, the physical review council “modified” the findings of the physical evaluation board by deleting all such findings and substituting therefor the finding “physically fit.” This action was supported by the following “Remarks”:
The member is deemed physically fit for the performance of active, military duty commensurate with his age and rank. This finding is in accord with current Army medical standards of fitness and unfitness for retention on active duty. (Paragraphs 2, and 87b, AR 40-504.) Rebuttal considered.
(d) On September 23, 1959, plaintiff submitted to the Adjutant General a lengthier, more detailed rebuttal “to Re *931 view of Proceedings of [the] Physical Evaluation Board.”[5] In this statement plaintiff asserted that he was “still a patient at the * * * hospital * * * and * * *” had been “since June 1, 1959.” He referred to the “instability” of his “lower extremities (particularly caused by neuritis pains in my left leg and by an inherent weakness in my right leg) * * to “* * * the certificate of the cardiologist, dated 18 September 1959, attached * * and “* * * that additional cardiograms with exercise tests (to induce Anginal Pectoris symptoms) were not accomplished because * * * the cardiologist advised that no point would be served by putting additional strain on my heart in order to further emphasize a point which had already been established. * * *”
(e) Attached to the foregoing statement of rebuttal were the following:
1. Addendum [dated 18 September 1959] to Cardiac Consultation done on 11 August 1959 * * *:
It is emphasized that this officer demonstrated a positive Two-Step Master’s Test (single) on 11 August 1959. This, coupled with a typical history of angina pectoris, is sufficient, in my opinion, to definitely establish the diagnosis of Arteriosclerotic Heart Disease with Arngina Pectoris (4109). His American Heart Association Classification is IIB.
2. Addendum [dated 21 September 1959] to Neuro-surgical Diagnosis * * *:
Further roentgenographio studies have revealed that this officer has “osteoarthritic lipping in the dorsal spine.” This would indicate multiple involvement rather than lumbosacral involvement alone. An additional symptom which has not been noted previously and should be documented has been a 6 or 7 year history of intermittent paresthesias in the ulnar distribution when the arms are flexed or elevated, and relieved by the dependent position. The cervical spine reveals no encroachment on the roots; there is “some straightening of the normal cervical curve.” Accordingly, the applicable diagnosis is: Degenerative Joint Disease, Multiple (Lumbosacral and Dorsal) #7230.
*932 (f) On September 29, 1959, the Adjutant General forwarded to the physical disability appeal board the proceedings of the physical evaluation board and the physical review council, for review, together “with rebuttal which indicates disagreement with the action of the council * *
(g) On October 2, 1959, the physical disability appeal board considered plaintiff’s case, concurred with the physical review council, and found plaintiff “to be physically fit for active duty.”
(h) On October 13, 1959, the Adjutant General forwarded to the Commanding Officer of the hospital notice of the issuance of orders for plaintiff’s retirement.
(i) On October 16,1959, plaintiff forwarded to the Adjutant General a Request for Re-Evaluation of Physical Condition, from which the following are excerpts:
These diseases listed by the Medical Board are all among those generally characterized as likely to become more severe and permanent in nature with the passing of time.
This situation * * * has occurred particularly in the case of the Arteriosclerotic Heart Disease which has progressed in its severity within the past 60 to 90 days and I am undergoing additional treatment from the cardiac specialists at the hospital for the anginal attacks which I have been experiencing.
(j) On October 29, 1959, the following “Info Note” [6] was appended to the foregoing request:
Lt. Col. Hendren & Capt. Lochmund (APRC) both agree that off [sic] has had full opportunity to present his case and no further action is required * * *.[7]
(k) Pursuant to orders plaintiff was released, on October 31, 1959, from assignment to the hospital and from further duty, and placed on the retired list on November 1, 1959.
(l) There is no evidence to indicate that plaintiff has made application for the correction of his military records.
8. Army Regulations AR 40-504 (28 June 1955, with Changes No. 1, 6 February 1959) set forth “Standards of *933 Medical Fitness for Retention on Active Duty and for Retention in the Reserve Components of the Army Not on Active Duty.” Following are (1) a portion of Section 1 and (2) the full text of Section 2a:
1. Purpose. These regulations establish standards of medical fitness for retention on active duty and for retention in the Reserve Components of the Army not on active duty. They also provide uniformity in the determination of disabilities which warrant disability separation or retirement or warrant retention. Each individual’s case will be considered on its own merits, the object being to determine whether the individual is medically qualified for further military service. * * *
2. Evaluation of physical disabilities, a. Title 10, United States Code, sections 1201-1217,1372,1373,1401-1403 (formerly Title TV, Career Compensation Act of 1949) provides benefits for those members who have become unfit to perform the duties of their office, rank, grade, or rating by reason of physical disability and who otherwise qualify under the act. Most members possess some physical imperfections which are recorded in. the Veterans Administration Schedule for Rating Disabilities, but this act does not provide rights or benefits for physical disability to members who are not determined to be unfit, regardless of the percentage of disability under that schedule from a single disability or accumulation of disabilities. The fact that a member has physical disability which is rateable in accordance with the Veterans Administration Schedule for Rating Disabilities must not be considered a guide in judging fitness or capacity to perform active duty, but this determination is based wholly on the individual’s physical and mental capacity to serve in the military service. The presence of rateable disabilities, though not causing unfitness under the act, may provide rights and benefits under laws administered by the Veterans Administration and should be made a matter of record whenever discovered.
9. (a) The disabilities deemed ratable by the physical evaluation board are set forth in finding 5. Summarized for present purposes, they were (1) “radiculoneuritis * * * VA Code 5299/5294 * * *”; and (2) “femur, impairment of * * * VA Code 5255 * *
*934 (b) Following are summaries of the VA Code numbers listed by the physical evaluation board:
YA Code 5294 Sacro-iliac injury and weakness:
Severe ^ * * _________ — _—_ 40
With muscle spasm on extreme forward bending, loss of lateral spine motion, unilateral, in standing position-20
With characteristic pain on motion-10
With slight subjective symptoms only- 0
VA Code 5299 [There is no VA Code 5299]
VA Code 5295 Lumbosacral strain: Rate by comparison with sacro-iliac injury
VA Code 5255 Femur, impairment of—
Fracture * * * with nonunion, with loose motion * * *-80
Fracture * * * with nonunion, without loose motion * * *— 60
Fracture * * * with false joint_60
Malunion of—
With marked knee * * * disability-30
With moderate knee * * * disability-20
With slight knee * * * disability-10
(c) Following are excerpts from AR 40-504 cited by defendant in its brief as pertinent to the disabilities considered ratable by the physical evaluation board:
50. Hernia, a * * * Diaphragmatic hernia is very often correctible by surgery.[8]
69. Arthritis, a. Arthritis, if relatively asymptomatic, is usually not considered to render an individual unfit.
b. Osteoarthritis is a systemic disease which usually occurs in later life and corresponds to the aging process of the individual. An individual who has only X-ray evidence of osteoarthritis or who has a slight stiffness or localized soreness or a history of infrequent incapacity should seldom, if ever, be considered as being unfit for retention in the service because of this condition alone. * * *
71. Saero-iliae strain. Sacro-iliac strain, chronic, mild, is not usually considered to render an individual unfit.
81. Synovitis. Synovitis, per se, is not usually considered to render an individual unfit unless moderate to severe in degree and does not respond to prolonged treatment.
87. Diseases of peripheral nerves. * * *
b. Neuritis. Neuritis involves loss of nerve function and may render an individual unfit, depending upon the nerve or nerves involved. Consideration should be given to the cause and likelihood of recovery in establishing the permanence of the condition. Some improvement occurs m most cases of neuritis, and complete recovery is not *935 infrequent. When a member is temporarily incapacitated because of neuritis, evidence of nerve regeneration should be considered in determining the probable duration of the incapacity.
10. (a) The physical evaluation board reported that arteriosclerotic heart disease was considered by it, but “considered not ratable at this time” (which was July 29, 1959).
(b) Following is the text of the pertinent VA Code:
YA Code 7005 Arteriosclerotic heart disease:
During and for 6 months following acute illness from coronary occlusion or thrombosis, with circulatory shock, etc_100
Following typical history of acute occlusion or thrombosis, more than strictly sedentary employment precluded_ 80
Following typical history of acute coronary occlusion ox-thrombosis as above, or with history of substantiated repeated anginal attacks, more than light manual labor not feasible_ 60
Following typical coronary occlusion or thrombosis, or with history of substantiated anginal attack, ordinary manual labor feasible- 30
Note. — Authentic myocardial insufficiency with arteriosclerosis may be substituted for occlusion.
(c) Following are excerpts from AB, 40-504 cited by defendant in its brief as pertinent to the consideration by the physical evaluation board (and the physical disability appeal board) of the diagnosis of arteriosclerotic heart disease:
35. Arteriosclerotic heart disease, a. Arteriosclerotic heart disease manifests itself through coronary arteriosclerosis, and the extent of the disability will depend upon the individual’s ability to carry on physical activity without discomfort, dyspnea, or cardiac failure. Considerable credence must be given the individual’s history; often this may be unreliable.
b. Documented symptomatic acute myocardial infarction.
(1) An individual who has had a documented symptomatic acute myocardial infarction will be considered as unfit for retention. * * *
38. Hypertension and hypertensive cardiovascular disease. * * *
b. Standard. In general, individuals with early or mild hypertension should not be found unfit. * * *
39. Arteriosclerosis. Arteriosclerosis without symptomatic focalization usually does not render an individual unfit.
*936 (d) There is no indication in the evidence that plaintiff ever suffered a myocardial infarction.
11. (a) Following are further excerpts from AB. 40-504, Section X, Heart and Vascular System, Paragraph 35, Ar-teriosclerotic heart disease:
* * * * *
o. If no abnormal signs are found and if the symptoms are indefinite, it is not likely that any incapacitating disability exists. A diagnosis of arteriosclerotic heart disease under such circumstances is usually difficult to substantiate, and the individual should usually be found “fit” for duty.
d. Individuals who have no history of cardiac symptoms and/or positive physical signs, past or present, but who during the course of a routine physical examination exhibit an abnormal electrocardiogram which reveals abnormalities compatible with the residuals of a healed myocardial infarction should as a general rule be considered “fit” for continued military service. If subsequent study and followup evaluation reveals further deterioration of the electrocardiogram or other positive symptoms or findings of coronary or myocardial insufficiency, it is usually appropriate to consider the individual unfit for further military service even though there has never been a positive history or documented findings of the acute myocardial infarction. Individuals whose only abnormality consists of abnormalities of the electrocardiograms, such as low voltage or negativity of the T waves, should not be diagnosed as arteriosclerotic heart disease without other objective or subjective findings to corroborate such diagnosis as there are many conditions which can produce such abnormalities. Asymptomatic individuals whose only abnormality is an abnormal response in the postexercise electrocardiogram (positive Master’s test) should as a general rule be considered fit for continued military service, as the determining factor in such instance should be the presence or absence of clinical coronary insufficiency of a severity to produce unfitness or disability. See paragraph 36 regarding bundle-branch block associated with arteriosclerotic heart disease.
(b) A distinction has been noted hereinabove between (1) the medical evidence of arteriosclerotic heart disease that was before the physical evaluation board and (2) the representations by plaintiff pertaining to his heart condition that *937 were before (i) tbe physical review council and (ii) the physical disability appeal board.
Whereas the physical evaluation board noted the presence of arteriosclerotic heart disease but considered it not ratable at the time, it likewise took note at plaintiff’s hearing of symptoms related to angina pectoris. Upon plaintiff’s request for a reevaluation of his heart condition, the medical board made a further examination as a result of which it certified a diagnosis of arteriosclerotic heart disease with angina pectoris. This certificate was attached to the rebuttal statement which plaintiff filed with the physical review council. One month later (after action by the physical review council), the same medical officer “emphasized” that plaintiff had “demonstrated a positive two-step Master’s test” which, “coupled with a typical history of angina pectoris,” was sufficient, in his opinion, “to definitely establish the diagnosis of arteriosclerotic heart disease with angina pectoris,” and “American Heart Association Classification * * * [of] IIB.” This certificate was attached to the rebuttal statement which plaintiff filed with the physical disability appeal board.
12. (a) The following inferences are warranted by the evidence as a whole:
(1) That the nature and extent of plaintiff’s arterioscle-rotic heart disease were not fully identified (i) at the time plaintiff entered the hospital on June 1, 1959, or (ii) at the time of his appearance before the physical evaluation board on July 29,1959.
(2) That further examinations conducted in August and September 1959 identified the arteriosclerotic heart disease as definitely accompanied by angina pectoris.
(3) That both AN 40-504 and the VA Code recognize distinctions between arteriosclerotic heart disease with and without angina pectoris and between arteriosclerotic heart disease with angina pectoris and various forms of hypertension.
(b) Under the circumstances, the medical certificates which plaintiff filed with the physical review council and the physical disability appeal board as attachments to his statements of rebuttal were essentially new evidence and entitled to consideration as such.
*938 (c) The findings of physical fitness entered by the physical review council and the physical disability appeal board, in the face of new evidence which had not been evaluated by a board authorized to assess a rating of disability (if disability should be found to exist), cannot under the circumstances of this case be said to be supported by substantial evidence. It is therefore concluded that these findings were arbitrary and capricious.
13. Without the findings of physical fitness entered by the physical review council and adopted by the physical disability appeal board, the record reflects the finding entered by the physical evaluation board of 40 percent disability. This finding must now be accepted as unimpaired, except that it is, of course, too late for the physical evaluation board’s recommendation of temporary retirement to be implemented.
CONCLUSION 03? Law
On the foregoing findings of fact, which are made a pare of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. Determination of the amount of recovery will be made in .further proceedings pursuant to Rule 47(c).

 Plaintiff was born on May 20, 1913, in Salt Lake City, Utah. At the time of trial he resided in California.

 Plaintiff was released from “assignment” to the hospital on November 4, 1959.

 The evidence in the instant case is all documentary, consisting of plaintiff's medical and administrative record and excerpts from Army regulations.

 By inference it appears that this rebuttal statement was intended for the physical review council.

 Tie inference is clear that this statement of rebuttal was intended for the physical disability appeal board.

 This note was initialed “WED.” The Adjutant General at the time was William H. Durand.

 Captain Lochmund is identified in the record as recorder of the physical review council.

 Hiatus hernia (as diagnosed) Is daphragmatie.